**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| ZAKIYYAH JOHNSON, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHELL FEDERAL CREDIT UNION, and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No. 4:21-cv-3608<br><br><br>**CLASS ACTION - COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

## I    CLASS ACTION COMPLAINT

1.    Plaintiff Zakiyyah Johnson ("Plaintiff"), by her attorneys, hereby brings this class and representative action against Shell Federal Credit Union ("Defendant") and DOES 1 through 5.

## II    NATURE OF THE ACTION

2.    Plaintiff brings this lawsuit against Defendant on behalf of Defendant's members, on the basis that Defendant has violated and continues to violate federal and Texas state law. First, Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq*., ("Reg E" or "Regulation E"), requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure of their overdraft services (opt-in disclosure agreement); (2) provide that disclosure as a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent of a customer's agreement to opt into the financial institution's overdraft program; and

1

(4) provide confirmation of the customer's consent, including a statement informing the customer of the right to revoke such consent. Financial institutions are not permitted to include any additional information in the opt-in disclosure agreement unless specifically authorized by Regulation E, and financial institutions must ensure these procedures are followed no matter the medium used to offer customers the option to opt-in, whether online, by telephone, or in person at a branch. Furthermore, financial institutions must not tie other benefits to an opt-in decision or pre-checked boxes by the "opt-in" option on the opt-in disclosure agreement. Financial institutions are also prevented from aggressively marketing the benefits of Regulation E overdraft coverage, promoting the coverage as short-term credit programs, or otherwise encouraging customers to opt into their programs.

      3.      As part of its purported compliance with Regulation E, Defendant provides its members with a Regulation E opt-in disclosure agreement describing the credit union's overdraft service as "What You Need to Know About Overdrafts and Overdraft Fees."[1] Defendant's Regulation E opt-in disclosure agreement, however, provides members with ambiguous, misleading, and/or inaccurate language to describe the circumstances in which Defendant will charge a member an overdraft fee. Specifically, the opt-in disclosure agreement does not disclose Defendant's use of an internal artificial account balance to determine if a debit card or ATM transaction will be considered overdrawn (*i.e.*, "available balance"), instead of the official and actual balance of the account. Not only does it not disclose the use of the available balance to assess overdraft fees on these specific transactions, it describes an overdraft using language that conveys Defendant's use of the actual balance instead of the artificial available balance to assess

---

[1] *See* document titled "What You Need to Know About Overdrafts and Overdraft Fees" attached hereto as Exhibit A, which, based on information and belief, reflects the text of Defendant's Regulation E opt-in disclosure agreement.

overdraft fees. Thus, Defendant does not provide its members, including Plaintiff, with an accurate and/or easily understandable opt-in disclosure agreement describing the circumstances or conditions in which Defendant charges overdraft fees that Regulation E requires.

4.      Because Regulation E does not permit financial institutions to charge overdraft fees on one-time debit card and ATM transactions until they obtain affirmative consent from customers through proper enrollment procedures, including an accurate disclosure of overdraft practices in a stand-alone opt-in disclosure agreement, Defendant's assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal. Further, Regulation E makes illegal Defendant's continued use of a non-conforming disclosure agreement to market its overdraft program and "opt-in" new members. Regulation E provides a cause of action against financial institutions that fail to abide by its requirements.

5.      Second, Defendant's actions also violate the Texas Deceptive Trade Practices Act – Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.* ("DTPA"), because they represent that the services Defendant offers at one standard are actually offered at another standard, and because they represent that the parties' agreement confers or involves rights, remedies, or obligations which it does not have or involve. These acts include, but are not limited to, marketing its overdraft program and continuing to obtain new members' "consent" to be assessed overdraft fees by using an ambiguous, misleading, and/or inaccurate opt-in disclosure agreement that violates Regulation E, and from continuing to assess overdraft fees on Regulation E transactions until it obtains the consent of current members using a Regulation E-compliant disclosure agreement.

6.      Based on Defendant's violations, Plaintiff seeks statutory damages and the return of improperly charged overdraft fees within the statute of limitations period. Plaintiff also seeks

to enjoin Defendant from continuing to market its Regulation E overdraft program and obtain

new members' "consent" to be assessed overdraft fees by using an opt-in disclosure agreement

that violates Regulation E and from continuing to assess any further overdraft fees on Regulation

E transactions until it obtains the consent of current members using a Regulation E-conforming

opt-in disclosure agreement.

### III    NATURE OF THE ACTION

7.      All allegations herein are based upon information and belief except those

allegations pertaining to Plaintiff or counsel (unless otherwise stated). Allegations pertaining to

Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as

well as Plaintiff's or counsel's own investigation. Furthermore, each allegation alleged herein

either has evidentiary support or is likely to have evidentiary support, after a reasonable

opportunity for additional investigation or discovery.

8.      Plaintiff has brought this class action to assert claims in her own right and as the

class representative of all other persons similarly situated. Regulation E requires Defendant to

obtain informed consent, by way of a written stand-alone document that fully and accurately

describes in an easily understandable way its overdraft services, before charging members an

overdraft fee on one-time debit card and ATM transactions. Because of the substantial harm

caused by large overdraft fees on relatively small debit card and ATM transactions, Regulation E

requires financial institutions to put all mandated overdraft information in one clear and easily

understood document that is properly presented to customers for their consideration. Financial

institutions are not permitted to circumvent this requirement by referencing, or relying on, their

account agreements, disclosures, or marketing materials. Regulation E expressly requires a

financial institution to include all the relevant terms of its overdraft program within the four

corners of the document, creating a separate agreement with account holders regarding the institution's Regulation E overdraft policies. Defendant does not meet these requirements. It uses an opt-in disclosure agreement that inaccurately, misleadingly, and/or ambiguously describes the circumstances in which Defendant charges an overdraft fee on a paid transaction. Specifically, Defendant defines an overdraft in its opt-in disclosure agreement as occurring when the member does "not have enough money in [the member's] account to cover a transaction, but [Defendant] pay[s] it anyway." But Defendant's automated assessment of overdraft fees is not based on whether there is enough money in the actual account balance to pay the transaction. Instead, Defendant calculates account balances for overdraft purposes using an artificially reduced calculation Defendant creates through its own internal bookkeeping called the "available balance," which Defendant calculates by deducting money from the account that it unilaterally decides should be held for future transactions. When these future holds are accounted for, the calculation often results in a negative "available balance" existing only on paper, even though there is actually money in the account to cover a transaction and a positive account balance at the time of payment and posting. While this practice is unfair on its face, the disclosure of the practice is at issue, not the practice itself.

9.     Accordingly, Defendant's opt-in disclosure agreement not only fails to accurately disclose to members which balance is used to assess an overdraft fee (which failing to disclose in a clear and understandable way is all that is required for a Regulation E violation), it suggests that its overdraft policies for Regulation E transactions apply a member's actual balance when determining whether to charge an overdraft fee, when it actually uses a different, artificially lower balance.

10.     Defendant's use of the artificially reduced account balance instead of the actual account balance to determine whether to assess overdraft fees is material. Based on analysis with other financial institutions, it is likely Defendant assessed overdraft fees on 10-20% more Regulation E overdraft transactions than would otherwise be the case if it used the actual balance to determine if an account was overdrawn.

11.     Plaintiff has been harmed by Defendant's violations of Regulation E and the DTPA. She was opted-in to Defendant's overdraft program using the inaccurate, misleading, and/or ambiguous description of Defendant's overdraft practices, and has been assessed overdraft fees on Regulation E transactions (including at least one transaction that would not have received an overdraft fee using the actual balance, but was assessed an overdraft fee using the available balance) that were not permitted because Defendant had earlier obtained Plaintiff's "consent" using a noncompliant Regulation E opt-in disclosure agreement.

### IV     PARTIES

12.     Plaintiff Zakiyyah Johnson is a resident of Baytown, Texas, and a member of Defendant at all relevant times to the Harrisallegations in this Complaint.

13.     Based on information and belief, Defendant is a credit union with its headquarters and principal place of business in Deer Park, Texas. Defendant also maintains several branches throughout the State of Texas.

14.     Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

15.     Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

16.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

17.     At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

18.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

19.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

## V    JURISDICTION AND VENUE

20.    This Court has federal question subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1693m, and has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a). This Court also has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and, on information and belief, there are numerous members of the proposed class who are citizens of a state different from Defendant.

21.    Venue is proper in this District because Defendant maintains its headquarters in this District, transacts business in this District, and Defendant executed the unlawful policies and practices which are the subject of this action in this District.

## VI    BACKGROUND

### A.    Defendant Shell

22.    Defendant is a credit union headquartered in Deer Park, Texas, with approximately 11 branches throughout Texas. As of December 31, 2020, Defendant reported that it had just over 118,000 members and almost 400 employees. Defendant further reported holding more than $1.4 billion in assets. In 2020, Defendant also collected over $9 million in fee income, of which overdraft fees are believed to be a significant percentage.

23.    One of the main services Defendant offers is a "share draft" or checking account.[2] A checking account balance can increase or be credited in a variety of ways, including automatic

---

[2] Share draft account is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines. Debits decreasing the amount in a checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

### 1.    Assessment of Overdraft Fees

24.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item) and non-sufficient funds ("NSF") fees (a fee for a declined, unpaid returned item) to its members' accounts when it claims to have determined that an account has been overdrawn.

25.    The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account holder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation. The fee Defendant charges here constitutes very expensive credit that harms the poorest customers and creates substantial profit. According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[3]

---

[3] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Sept.. 17, 2021).

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added)[4]

26.    Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[5]

27.    Defendant's financial filings and practices reveal that it has followed these trends to the letter. Defendant charges an overdraft fee of $25.00 per item, with no limit on the number of fees that can be assessed per day. Even if it had been properly charging overdraft fees, the $25.00 overdraft fee bears no relation to its minute risk of loss or cost for administering overdraft

---

[4] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Sept. 17, 2021).
[5] Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Sept. 17, 2021).

services. But an overdraft fee's practical effect is to charge members who pay them an interest rate with an APR in the thousands.

### 2. Impact of Overdraft Fees

28.     Accordingly, overdraft fees are punitive fees rather than service fees, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[6] In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[7] More than 50% of those customers assessed overdraft fees do not recall opting into an overdraft program, *id*. at p. 5, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, *id*. at p. 10.

29.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees. *Id*. at p. 3. A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. *Id*. at p. 4. And non-whites are 83% more likely to pay an overdraft fee than whites. *Id*. at p. 3.

---

[6] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Sept. 17, 2021).

[7] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Sept. 17, 2021).

**B.      Regulation E**

30.      For many years, banks and credit unions have offered overdraft services to their account holders. Historically, the fees these services generated were relatively low, particularly when methods of payment were limited to cash, check, and credit card. But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee. The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts. Financial institutions thus recognized in overdraft fees a new and increasing revenue stream.

31.      As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small. As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

32.      Using common understanding, an overdraft occurs when two conditions are satisfied. First, the member initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction. Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall. An overdraft, therefore, is an extension of credit. The financial institution advancing the funds,

allows the account holder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[8] The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

33.     Before the Federal Reserve adopted Regulation E, many financial institutions unilaterally adopted internal "overdraft payment" plans. Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would cover the overdraft while charging the standard overdraft fee. Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning the $4 cup of coffee at Starbucks into a $40 cup of coffee.

34.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs. Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all. It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from account holders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions. After Regulation E's amendment, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM

---

[8] For a thorough description of the mechanics of an "overdraft," see https://www.investopedia.com/terms/o/overdraft.asp (last visited Sept. 17, 2021).

withdrawals if the consumer opted into the financial institution's overdraft program. Otherwise, the bank or credit union could either cover the overdraft without charging a fee, or direct the transaction to be denied at the point of sale. Further, without the opt-in, the financial institution could not charge an NSF fee incurred because denying an ATM withdrawal or one-time debit card purchase meant no transaction had taken place, and thus there was no transaction to return.

35.     After the CFPB's creation, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to account holders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225. The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[9]

36.     Given the state of overdraft programs prior to Regulation E's amendment, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By

---

[9] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest (using averages - 17,000% APR), all while assuming very little risk because only a very small percentage of the overdraft customers fail to repay the overdraft.

37.     Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts. It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document, not combined with other forms, disclosures, or contracts provided by the financial institution. It must also accurately disclose to the account holder the institution's overdraft charge policies. The account holder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 1005.4(a)(1). The financial institution must ultimately establish that the account holder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

38.     Further, when the Federal Reserve amended Regulation E to require consumer opt-in for overdraft protection, it expected that financial institutions would not actively encourage opt-in as a means to recover lost revenue resulting from the opt-in requirement. This expectation was made clear in the official interpretation of the amendment which stated that

"under Regulation DD,[10] advertisements may not be misleading or inaccurate" and similarly that financial "institutions must not market their overdraft services in a manner that constitutes an unfair or deceptive practice within the meaning of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*." *See* Electronic Fund Transfers, 75 FR 31665-01, 2010 WL 2212981 (F.R. June 4, 2010). Further, after implementation of the Consumer Financial Protection Act of 2010, financial institutions were prohibited from engaging in any "unfair, deceptive, or abusive act or practice . . . in connection with any transaction with a consumer for . . . overdraft services." 12 U.S.C. § 5531(a).

39.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their account holders before charging overdraft fees on eligible transactions.

40.     But financial institutions did not stop with charging these exorbitant penalty fees. Instead, many of them began manipulating the process as to when they would consider a transaction an overdraft, because the more overdrafts they could create, the more their profits would increase. To that end, they charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but extended overdraft fees to transactions paid with their customers' own money. That is, a financial institution would

---

[10] Regulation DD applies to depository institutions other than credit unions. The equivalent for state-chartered credit unions is TISA, 12 C.F.R. § 707.1, *et seq*.

unilaterally decide the account was overdrawn not because an account lacked funds, but based on an artificial calculation involving the money in the account minus holds the financial institution unilaterally reserved for future payments at some future date.

41.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account. "Actual balance," "ledger balance," or "current balance" or even "balance" are all terms used to describe the actual amount of the account holder's money in the account at any particular time. In contrast, "available balance" is a term of art the financial industry uses to describe the balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[11] But absent further explanation introducing these concepts to consumers, terms like "available balance" have little or no meaning to consumers. As a result, it is important for financial institutions to clarify what "available balance" is because it is only by defining that term that consumers can know what it means.

42.     Although financial institutions calculate two balances, the actual/ledger/current balance of the money in the account is the official balance of the account. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer— the official record of the account.

43.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual balance or the "available

---

[11] Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

balance" for overdraft and NSF assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed. Whether the financial institution uses the actual money in the account or other artificial balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

44.     Many financial institutions use the "available balance" for overdraft assessment purposes as it is consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance. The actual balance includes all money in the account. On the other hand, the available balance always subtracts any holds placed on the funds in the account that may affect the money in the account in the future. It never adds funds to the account. To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account. The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money. All of the account holder's money remains in the account, even the money Defendant has defined as "held." The fact that the money has a "hold" on it does not mean it has been removed from the account.

45.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and account holders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times, the financial institution uses the

customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

46.    A hypothetical demonstrates what the financial institution is doing under these circumstances. Suppose that an individual has $1,000. The individual intends to use $800 of this amount to pay rent. The individual then intends to use the other $200 to make his monthly car payment. But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off. The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill. This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due. And if the individual does find the additional $40 before paying the car payment, there will never be a problem. If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill. He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

47.    The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account. Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month. That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month. The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee. He approves the water bill payment, and it posts immediately. Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account. All three payments are made with the

individual's own account funds. The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive. However, even if the customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it. Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

48.     A financial institution that uses the "available balance" method of calculating overdrafts would come to a different conclusion. Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account. This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account. Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account. And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds. Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions. Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

49.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and

settlements that the practice of using the available balance instead of the actual amount of money

in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts *without clear*

*disclosure of that practice* likely violates Regulation E and other state laws. For instance, the

FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance"
> method or a "ledger balance" method to assess overdraft fees. The
> FDIC identified issues regarding certain overdraft programs that
> used an available balance method to determine when overdraft fees
> could be assessed. Specifically, FDIC examiners observed
> potentially unfair or deceptive practices when institutions using an
> available balance method assessed more overdraft fees than were
> appropriate based on the consumer's actual spending or when
> institutions did not adequately describe how the available balance
> method works in connection with overdrafts.[12]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

> A ledger-balance method factors in only settled transactions in
> calculating an account's balance; an available-balance method
> calculates an account's balance based on electronic transactions
> that the institutions have authorized (and therefore are obligated to
> pay) but not yet settled, along with settled transactions. An
> available balance also reflects holds on deposits that have not yet
> cleared. Examiners observed that in some instances, transactions
> that would not have resulted in an overdraft (or an overdraft fee)
> under a ledger-balance method did result in an overdraft (and an
> overdraft fee) under an available-balance method. At one or more
> financial institutions, examiners noted that these changes to the
> balance calculation method used were not disclosed at all, or were
> not sufficiently disclosed, resulting in customers being misled as to
> the circumstances under which overdraft fees would be assessed.
> Because these misleading practices could be material to a
> reasonable consumer's decision making and actions, they were
> found to be deceptive.[13]

---

[12]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf
(last visited Sept. 17, 2021).

[13] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Sept. 17, 2021).

50.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood. As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions. Either inaccurately or ambiguously describing the use of which balance a financial institution uses as part of its overdraft practice violates the plain language of Regulation E.

**C.     Defendant's Regulation E Practices**

51.     Defendant opts members into its Regulation E overdraft program using an opt-in disclosure agreement titled, "What You Need to Know About Overdrafts and Overdraft Fees." (Ex. A.) A reasonable consumer reading a disclosure agreement requiring a signature or acknowledgment, and which relates to overdrafts and overdraft fees and represents that it contains information the member needs to know about overdrafts and overdraft fees, would rely on the opt-in disclosure agreement without supplementing the knowledge with reference to other marketing materials or account agreement language relating to overdrafts.

52.     The opt-in disclosure agreement explains that an overdraft occurs "when you do not have enough money in your account to cover a transaction, but we pay it anyway." The agreement makes no reference to "available" balance or any description of how Defendant's internal hold policies affect the balance. The opt-in disclosure agreement instead only explains that an overdraft occurs when there is not "enough money in [the] account" and Defendant covers the transaction with its own funds. But Defendant fails to explain what it means for the

member to not have "enough money" in the account. In fact, Defendant does charge overdraft fees even when there is enough money in the account to cover the transaction and it uses that money to pay the transaction (not its own funds), which means that the opt-in disclosure agreement is not accurate.

53.     Many courts have already found that this exact same language is ambiguous, at the least, as to whether it means actual balance or the available balance is used in determining overdraft fees and constitutes a Regulation E violation.[14] By using inaccurate, misleading, and/or ambiguous language to describe what constitutes an overdraft, Defendant fails to provide the clear and easily understandable description of its overdraft services that Regulation E demands.

54.     Institutions that use an account's "available" balance to calculate overdrafts disclose it in their opt-in discosure agreements. For example, Synovus Bank defines an overdraft similarly to Defendant (*i.e.*, as when there is not enough money in an account), but it adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance. TD Bank's opt-in disclosure

---

[14] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Wellington v. Empower Fed. Credit Union*, Case No. 5:20-CV-1367, 2021 WL 1377789, at *4 (N.D.N.Y. Apr. 13, 2021); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

55.     In addition, many financial institutions that use the actual balance to determine whether an account is in overdraft (meaning it looks strictly at the amount of funds in an account), as does, *e.g.*, MidFlorida Credit Union, use language that references the actual balance, not the available balance. (*See* https://www.midflorida.com/terms-and-conditions/overdraft-agreement/ (last visited Sept. 17, 2021) (explaining that the language "[a]n overdraft occurs when you do not have enough money in your account to cover a transactions, but MIDFLORIDA pays it anyway" refers to the "[a]ctual balance").) Thus, if there is sufficient money in the account to cover a transaction—even if the money is subject to a hold for pending transactions—then the financial institution will not charge an overdraft fee.

56.     Because Defendant fails to accurately, clearly, and in an easily understandable way disclose its overdraft practices and fails to provide its members with a Regulation E complaint opt-in disclosure agreement, it therefore continues to charge Plaintiff and Class Members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E. Further, on information and belief, Defendant continues to "opt-in" new members to its overdraft program using the same improper opt-in disclosure agreement.

## VII    FACTUAL ALLEGATIONS AGAINST DEFENDANT

57.    At all relevant times, Defendant used the "available balance," and not the actual account balance, to determine whether to assess overdraft fees on one-time debit card and ATM transactions.

58.    At all relevant times, Defendant knew or should have known that in order to legally charge overdraft fees to members, it was required to first obtain affirmative consent from the member using a Regulation E compliant stand-alone opt-in disclosure agreement. Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language.

59.    At all relevant times, Defendant used an identical opt-in disclosure agreement with Plaintiff and all putative class members that defined an overdraft as occurring "when you do not have enough money in your account to cover a transaction, but we pay it anyway."

60.    This definition of overdraft would disclose and be interpreted by reasonable customers to mean as follows: (1) "not enough money in your account" means the Actual balance/Current Balance/Ledger Balance in the account; (2) to "cover a transaction" means that the overdraft decision is made at time of posting and payment; and (3) "the transaction is paid anyway" means that Defendant has advanced or loaned the member money to pay the transaction. However, as Defendant determines overdraft fees based on the "available balance" that factors in credit and debit holds, approximately 10-20% of overdraft fees are assessed on transactions when there was money in the account to cover the transaction at the time it was posted and paid, and Defendant did not advance or loan the customer any money to pay the transaction.

61.     The opt-in disclosure agreement does not, *inter alia*, accurately and in a clear and easily understandable way describe what constitutes an overdraft and under what circumstances the member would be assessed an overdraft fee, and as such the opt-in disclosure agreement does not comply with Regulation E's requirements.

62.     Because Defendant uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices, Defendant has no legal basis on which to charge members overdraft fees on one-time debit card and ATM transactions, yet it does so anyway.

63.     At all relevant times, Defendant knew it was using a specific "available balance" methodology to assess overdraft fees, and further knew or should have known that this methodology should be clearly and accurately described in a stand-alone document. Defendant also knew or should have known that its opt-in disclosure agreement failed to provide an accurate, clear and easily understandable definition of an overdraft when it identified an overdraft as "when you do not have enough money in your account to cover a transaction, but the transaction is paid anyway."

64.     At all relevant times, Defendant misrepresented its overdraft program and promoted it inaccurately and/or in a misleading way.

65.     At all relevant times, Defendant charged Plaintiff and the putative class overdraft fees on one-time debit card and ATM transactions even though it had not complied with Regulation E to first obtain members' affirmative consent using a Regulation E compliant opt-in disclosure agreement before it charged these fees.

66.     Based on information and belief, Defendant continues to charge existing members overdraft fees on one-time debit card and ATM transactions who had "opted-in" using that same non-compliant opt-in disclosure agreement.

67.    Based on information and belief, Defendant continues to market it Regulation E overdraft program and "opt-in" to its overdraft program members using a non-compliant opt-in disclosure agreement, and then charges those members overdraft fees on one-time debit card and ATM transactions.[15]

## VIII    PLAINTIFF'S HARM

68.    Plaintiff has held an account with Defendant at all times relevant to the allegations and is believed to be opted into its overdraft program for her debit card and ATM transactions.

69.    As will be established using Defendant's own records, Plaintiff has been assessed numerous improper fees on debit card and ATM transactions. On at least one occasion, Plaintiff was charged overdraft fees even when there was enough money in her account to cover her transaction. For example, on January 10, 2021, Plaintiff was assessed a $25 overdraft fee on a $82.99 non-recurring debit card transaction even though Plaintiff had a positive account balance and money in the account ($180.39) to pay the transaction. On that same day, Plaintiff was assessed a second $25 overdraft fee on a subsequent $20 non-recurring debit card transaction even though Plaintiff still had a positive account balance and money in the account ($72.40)—a positive balance that would have been even higher ($97.40) if not for the previously charged $25 overdraft fee. Based on information and belief, Defendant was not required to advance any of its own funds to cover the transactions, and Plaintiff was only assessed an overdraft fee because Defendant used the available balance instead of the actual balance to determine if the account was overdrawn.

---

[15] Because Defendant does not make information about how it opts in its members publicly available, the complaint may be amended following discovery to include additional grounds for Defendant's Regulation E violations.

70.     The extent of improper charges Defendant assessed upon Plaintiff and other members will be determined in discovery using Defendant's records.

71.     Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys. While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2021 because Defendant was creating confusion among its members by describing different practices in agreements and other materials it was disseminating to members. This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

## IX     CLASS ALLEGATIONS

72.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

73.     Plaintiff brings this case, and each of the respective causes of action, as a class action.

74.     The "Class" is composed of:

The Regulation E Class:

> All members of Shell who have or have had accounts with Shell who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning on January 1, 2010 and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

**The DTPA Class:**

> All members of Shell who have or have had accounts with Shell who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning two years preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

28

The Equitable Claims Class:

> All members of Shell who have or have had accounts with Shell
> who were assessed an overdraft fee on a one-time debit card or
> ATM transaction beginning two years preceding the filing of this
> complaint and ending on the date the Class is certified. Following
> discovery, this definition will be amended as appropriate.

75.    Excluded from the Classes are: 1) any entity in which Defendant has a controlling

interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to

work on the case; and 4) all employees of the law firms representing Plaintiff and the Class

Members.

76.    This action has been brought and may be properly maintained on behalf of each

member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

77.    **<u>Numerosity</u>** – The members of the Class ("Class Members") are so numerous that

joinder of all Class Members would be impracticable. While the exact number of Class Members

is presently unknown to Plaintiff and can only be determined through appropriate discovery,

Plaintiff believes based on the percentage of account holders harmed by these practices in

circumstances with similar banks and credit unions with similar practices, that the Class is likely

to include thousands of Defendant's members.

78.    Upon information and belief, Defendant has databases, and/or other

documentation, of its members' transactions and account enrollment. These databases and/or

documents can be analyzed by an expert to ascertain which of Defendant's members has been

harmed by its practices and thus qualify as a Class Member. Further, the Class definitions

identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to

allow a member of that group to identify himself or herself as having a right to recover. Other

than by direct notice through mail or email, alternative proper and sufficient notice of this action

may be provided to the Class Members through notice published in newspapers or other publications.

79. **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether Defendant used and/or uses the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions.

- Whether Defendant's opt-in disclosure agreement violates Regulation E because it does not accurately, clearly, and in an easily understandable way describe Defendant's Regulation E overdraft program.

- Whether Defendant violated Regulation E by assessing overdraft fees on one-time debit card and ATM transactions against Class Members.

- Whether Defendant's conduct in violation of Regulation E also violates the DTPA.

- Whether Defendant's conduct makes it liable under claims for unjust enrichment and money had a received.

- Whether Defendant continues to violate Regulation E, the DTPA, and/or unjustly enrich itself by opting in members using its opt-in disclosure agreement and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on its opt-in disclosure agreement.

- Whether, *inter alia*, Defendant violated Regulation E, the DTPA, and/or unjustly enriches itself by failing to opt members into its overdraft program by legal

means, including properly publishing the opt-in form; obtaining and preserving members' written consent; and sending confirmation of members' decisions to opt-in and instructions on how to opt out of the overdraft program.

80.     **Typicality** – Plaintiff's claims are typical of all Class Members. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure agreement Defendant used to opt-in Plaintiff is the same as the opt-in disclosure agreement Defendant used to opt-in the Class Members. Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions. Accordingly, Plaintiff will serve the interests Class Members.

81.     **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and counsel intend to prosecute this action vigorously.

82.     **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for

Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

83.     Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

84.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To

the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

85.    This matter is properly maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class; and

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

86.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rules of Civil Procedure, Rule 23(b)(2). Moreover, on information and belief, Plaintiff alleges that Defendant's use of a non-compliant Regulation E opt-in disclosure agreement is substantially likely to continue in the future if an injunction is not entered.

## X      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of Regulation E

### (12 C.F.R. §§ 1005, *et seq*.)

87.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

88.     By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

89.     Specifically, Defendant's conduct violated Regulation E's "Opt In Rule." *See* 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added). The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is

accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17, prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account, nor can the financial institutions influence a member's decision to opt-in.

90.    The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040, 59048, which is "the CFPB's official interpretation of its own regulation," "warrant[ing] deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

91.    Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against member accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions. Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its members an accurate and non-ambiguous description of the overdraft program that members can understand in a "clear and readily understandable way."

92.     Defendant has selected an opt-in method that fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states in the non-conforming disclosure agreement that an overdraft occurs when there is not enough money in the account to cover a transaction but Defendant pays it anyway. But, in fact, Defendant assesses overdraft fees even when there is enough money in the account to pay for the transaction and Defendant needs to advance no funds at all. This is accomplished by using the internal bookkeeping available balance to assess overdraft fees, rather than the actual and official balance of the account. Defendant failed to use language to describe the overdraft service that identified that it was using the available balance to assess overdraft fees, which meant that in a significant percentage of the transactions that were the subject of the overdraft fee, there was money in the account to cover the transaction and Defendant did not have to advance any money—yet Defendant assessed an overdraft fee anyway.

93.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, Defendant was not and is not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

94.     As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION

**Violation of the Deceptive Trade Practices Act – Consumer Protection Act**

**(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

95.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

96.    Plaintiff and Class Members are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets) who sought or acquired by purchase or lease, goods or services, *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers," pursuant to Texas Business and Commercial Code § 17.45(4). Defendant is a "person" within the meaning of Texas Business and Commercial Code § 17.45(3).

97.    Defendant is engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Texas Business and Commercial Code § 17.46(a).

98.    Defendant's conduct described herein violates the DTPA, which prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

99.    At a minimum, Defendant violated the DTPA by representing that the opt-in disclosure agreement had characteristics, uses, benefits, and qualities which it did not have; representing that the opt-in disclosure agreement was of a particular standard and quality when it was not; representing that an agreement conferred or involved rights, remedies or obligations

which it did not have, and which was prohibited by law; and omitting material facts in describing the opt-in agreement.

100.    As a direct and proximate result of Defendant's violations of the DTPA, Plaintiff and Class Members have been assessed improper and illegal overdraft fees and had those funds removed from their account, and Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations described in this Complaint.

101.    Further, absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting Defendant from misrepresenting and omitting material information concerning its overdraft fee policy at issue in this action in the future and requiring Defendant to immediately stop charging illegal overdraft fees unless and until it re-opts-in current members using a Regulation E compliant opt-in disclosure agreement, Plaintiff and other existing Class Members, and the general public, will suffer from and be exposed to Defendant's conduct violative of the DTPA.

102.    Defendant made representations of goods or services that were inaccurate, false, and misleading when it used a noncompliant Reg E opt-in disclosure agreement that inaccurately described its overdraft practices. Specifically, Defendant failed to state or clearly describe that an overdraft occurs when the "available balance" is below zero, and instead used language indicating it used a member's actual account balance to determine and assess overdraft fees.

103.    Defendant engaged in misleading, false, unfair, and deceptive acts or practices that violated the DTPA by failing to disclose and actively concealing material terms in the opt-in disclosure agreement.

104.     In the course of their business, Defendant knew or should have known, that in order to legally charge its members overdraft fees, it was required to first obtain affirmative consent from members using a Regulation E compliant stand-alone opt-in disclosure agreement that accurately disclosed all material parts of its overdraft program in clear and easily understood language. Yet, Defendant did not disclose this information; it concealed and suppressed material facts concerning how it charged overdraft fees in the disclosure agreement, intending to induce Plaintiff and the class to enter into the transaction. Plaintiffs would not have entered into the transaction on the same terms had the information about Defendant's overdraft practices been disclosed in compliance with Regulation E.

105.     The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiff and the Class members, as it would have been to all reasonable consumers.

106.     Plaintiff and Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information about its Regulation E overdraft practices. Defendant's conduct was a producing cause of Plaintiff's and the Class' losses.

107.     Defendant's violations present a continuing risk to Plaintiff and Class Members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

108.     Pursuant to Texas Business and Commercial Code § 17.50, Plaintiff and the Class seeks an order enjoining Defendant's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the DTPA.

109.     On September 17, 2021, Plaintiff sent a letter complying with Texas Business and Commercial Code § 17.505(a).

## THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

110.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

111.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

112.     Because Plaintiff and the Class Members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiff and Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Money Had and Received)

113.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

114.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

115.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the

Class Members. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

<h2 style="text-align:center">XI    PRAYER FOR RELIEF</h2>

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

    a.    for an order certifying this action as a class action;

    b.    for an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

    c.    For an injunction requiring Defendant to stop enrolling individuals in its overdraft program using a form that does not accurately reflect the terms of that program.

    d.    for statutory damages;

    e.    for civil penalties;

    f.    for an order enjoining the continued wrongful conduct alleged herein;

    g.    for costs;

    h.    for pre-judgment and post-judgment interest as provided by law;

    i.    for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

    j.    for such other relief as the Court deems just and proper.

Dated: November 2, 2021          Respectfully Submitted,

                          */s/  Bruce W. Steckler*
                          Bruce W. Steckler
                          TX Bar No. 00785039
                          STECKLER WAYNE COCHRAN
                          CHERRY PLLC
                          12720 Hillcrest Road, Suite 1045
                          Dallas, Texas 75230
                          Telephone: (972) 387-4040
                          Facsimile: (972) 387-4041
                          bruce@swclaw.com

Richard D. McCune (CA State Bar No. 132124)*
rdm@mccunewright.com
David C. Wright (CA State Bar No. 177468)**
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116

*Attorneys for Plaintiff Jessica Ward*
*and the Putative Class*

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

*/s/  Bruce W. Steckler*

Bruce W. Steckler
TX Bar No. 00785039
STECKLER WAYNE COCHRAN
CHERRY PLLC
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
bruce@swclaw.com

Richard D. McCune (CA State Bar No. 132124)*
rdm@mccunewright.com
David C. Wright (CA State Bar No. 177468)**
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116

*Attorneys for Plaintiff Jessica Ward*
*and the Putative Class*

*Petition for Admission to be submitted

42